# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO.)

## I.(a) PLAINTIFFS

Ifran Ali

**DEFENDANTS**

Anthony M. Aiello; Anthony S. Murry; Julie Myers; Michael Chertoff; Alberto Gonzales; Captain Mark Chandless

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

Santa Clara

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Robert B. Jobe, Law Office of Robert B. Jobe, 550 Kearny St., Ste. 200, San Francisco, CA 94108  (415-956-5513)

ATTORNEYS (IF KNOWN)

US Attorney's Office, 450 Golden Gate, 11th Fl,, San Francisco, CA 94102

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☑ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF
AND ONE BOX FOR DEFENDANT)
(For diversity cases only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☑ Original Proceeding

☐ Removed from State Court

☐ Remanded from Appellate Court

☐ Reinstated or Reopened

☐ Transferred from Another district (specify)

☐ Multidistrict Litigation

☐ Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐610 Agriculture | ☐422 Appeal 28 USC 158 | ☐400 State Reapportionment |
| ☐120 Marine | ☐310 Airplane | ☐362 Personal Injury Med Malpractice | ☐620 Other Food & Drug | ☐423 Withdrawal 28 USC 157 | ☐410 Antitrust |
| ☐130 Miller Act | ☐315 Airplane Product Liability | ☐365 Personal Injury Product Liability | ☐625 Drug Related Seizure of Property 21 USC 881 | | ☐430 Banks and Banking |
| ☐140 Negotiable Instrument | ☐320 Assault Libel & Slander | ☐368 Asbestos Personal Injury Product Liability | ☐630 Liquor Laws | **PROPERTY RIGHTS** | ☐450 Commerce/ICC Rates/etc. |
| ☐150 Recovery of Overpayment & Enforcement of Judgment | ☐330 Federal Employers Liability | | ☐640 RR & Truck | ☐820 Copyrights | ☐460 Deportation |
| ☐181 Medicare Act | ☐340 Marine | **PERSONAL PROPERTY** | ☐650 Airline Regs | ☐830 Patent | ☐470 Racketeer Influenced and Corrupt Organizations |
| ☐152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐345 Marine Product Liability | ☐370 Other Fraud | ☐660 Occupational Safety/Health | ☐840 Trademark | ☐810 Selective Service |
| | ☐350 Motor Vehicle | ☐371 Truth in Lending | ☐690 Other | | ☐850 Securities/Commodities/ Exchange |
| ☐153 Recovery of Overpayment of Veteran's Benefits | ☐355 Motor Vehicle Product Liabiltiy | ☐380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐875 Customer Challenge 12 USC 3410 |
| ☐160 Stockholders Suits | ☐360 Other Personal Injury | ☐385 Property Damage Product Liability | ☐710 Fair Labor Standards Act | ☐861 HIA (1395ff) | ☐891 Agricultural Acts |
| ☐190 Other Contract | | | ☐720 Labor/Mgmt Relations | ☐862 Black Lung (923) | ☐892 Economic Stabilization Act |
| ☐195 Contract Product Liability | | | ☐730 Labor/Mgmt Reporting & Disclosure Act | ☐863 DIWC/DIWW (405(g)) | ☐893 Environmental Matters |
| ☐196 Franchise | | | ☐740 Railway Labor Act | ☐864 SSID Title XVI | ☐894 Energy Allocation Act |
| | | | ☐790 Other Labor Litigation | ☐865 RSI (405(g)) | ☐895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐791 Empl.Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐210 Land Condemnation | ☐441 Voting | ☐510 Motion to Vacate Sentence Habeas Corpus: | | ☐870 Taxes (US Plaintiff or Defendant | ☐950 Constitutionality of State Statutes |
| ☐220 Foreclosure | ☐442 Employment | ☑530 General | | ☐871 IRS - Third Party 26 USC 7609 | ☐890 Other Statutory Actions |
| ☐230 Rent Lease & Ejectment | ☐443 Housing | ☐535 Death Penalty | | | |
| ☐240 Torts to Land | ☐444 Welfare | ☐540 Mandamus & Other | | | |
| ☐245 Tort Product Liability | ☐440 Other Civil Rights | ☐550 Civil Rights | | | |
| ☐290 All Other Real Property | ☐445 Amer w/ disab - Empl | ☐555 Prison Condition | | | |
| | ☐446 Amer w/ disab - Other | | | | |
| | ☐480 Consumer Credit | | | | |
| | ☐490 Cable/Satellite TV | | | | |

## VI. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

## VII. REQUESTED IN COMPLAINT:   ☐ CHECK IF THIS IS A CLASS ACTION   DEMAND $_____   CHECK YES only if demanded in complaint:
UNDER F.R.C.P. 23   JURY DEMAND: ☐ YES ☑ NO

## VIII. RELATED CASE(S)   PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
IF ANY   "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)   ☑ SAN FRANCISCO/OAKLAND   ☐ SAN JOSE

DATE  9/12/07   SIGNATURE OF ATTORNEY OF RECORD

1   Robert B. Jobe (Cal. State Bar #133089)
    Shoshana O'Keefe (Cal. State Bar #246203)
2   LAW OFFICE OF ROBERT B. JOBE
    550 Kearny Street, Suite 200
3   San Francisco, CA 94108
    (415) 956-5513 (phone)
4   (415) 840-0308 (fax)

5   Attorneys for Petitioner,
    Ifran Ali
6

7

8                UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11  IFRAN ALI,                          )   No.
                                        )   DHS Alien Number:  70-149-531
12          Petitioner,                 )
                                        )
13      v.                              )
                                        )
14  ANTHONY M. AIELLO, ASSISTANT        )   PETITION FOR WRIT OF
    FIELD OFFICE DIRECTOR, SAN          )   WRIT OF HABEAS CORPUS
15  FRANCISCO DISTRICT OFFICE, U.S.     )   PURSUANT TO 28 U.S.C. § 2241
    CUSTOMS AND IMMIGRATION             )
16  ENFORCEMENT; ANTHONY S.             )
    MURRY, IMMIGRATION JUDGE,           )
17  EXECUTIVE OFFICE FOR                )
    IMMIGRATION REVIEW; JULIE           )
18  MYERS, ASSISTANT SECRETARY, U.S.    )
    IMMIGRATION AND CUSTOMS             )
19  ENFORCEMENT; MICHAEL                )
    CHERTOFF, SECRETARY,                )
20  DEPARTMENT OF HOMELAND              )
    SECURITY; ALBERTO GONZALES,         )
21  ATTORNEY GENERAL, UNITED            )
    STATES; CAPTAIN MARK                )
22  CHANDLESS, WARDEN, YUBA             )
    COUNTY JAIL,                        )
23                                      )
            Respondents.                )
24                                      )

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

INTRADISTRICT ASSIGNMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

PETITIONER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

RESPONDENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.    IN DETERMINING THAT MR. ALI IS SUBJECT TO MANDATORY DETENTION AS AN ALIEN WHO "IS DEPORTABLE" UNDER INA § 237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii), THE IJ APPLIED AN INCORRECT LEGAL STANDARD – i.e., THE *JOSEPH* STANDARD – AND VIOLATED MR. ALI'S FIFTH AMENDMENT RIGHT TO DUE PROCESS. . 7

        A.    The *Joseph* Standard – Which Allows an Alien to Avoid Mandatory Detention "Only" If He Can Convince the IJ That the Government Is Substantially Unlikely to Establish the Charge or Charges That Subject the Alien to Mandatory Detention – Is Blatantly Unconstitutional . . . . . . 8

            1.    Affected Interest of the Individual . . . . . . . . . . . . . . . . . . . 12

            2.    Risk of Error and Probable Value of Additional Safeguards . . . 13

            3.    Governmental Interest And Potential Burden . . . . . . . . . . . . . 14

        B.    To Avoid the Serious Due Process Concerns Described Above, the Court Must Construe the Term "is Deportable" in § 1226(c) as Encompassing Only Those Aliens Who Have No Substantial Argument Against The Charges of Removability That Trigger Mandatory Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    II.    MR. ALI'S ARGUMENT AGAINST HIS DEPORTABILITY UNDER INA § 237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii), IS NOT ONLY SUBSTANTIAL BUT COMPELLING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1    Petitioner, Ifran Ali ("Mr. Ali"), hereby petitions this Court for a writ of habeas corpus to

2   remedy his unlawful detention by Respondents.  In support of this petition, Mr. Ali alleges as

3   follows:

4                                        **INTRODUCTION**

5        This petition for writ of habeas corpus concerns the proper scope of § 236(c) of the

6   Immigration and Nationality Act ("INA"), 8 U.S.C. § 1226(c), "commonly known as the INA's

7   'mandatory detention' provision." *Tijani v. Willis*, 430 F.3d 1241, 1244 (9th Cir. 2005)

8   (Tashima, J., concurring).  That provision directs "the Attorney General to "take into custody

9   any alien who," *inter alia*, "*is deportable*" for having been convicted, at any time after

10  admission, of two crimes involving moral turpitude ("CIMT").  (Emphasis added).  Aliens who

11  are subject to mandatory detention under § 1226(c) are ineligible for release during the pendency

12  of their removal proceedings unless "certain strict conditions are met." *In re Rojas*, 23 I & N

13  Dec. 117, 119 (BIA 2001), *citing* 8 U.S.C. § 1226(c)(2).

14       "[A] detainee who claims that he is not covered by § 1226(c)" is given a hearing at which

15  he "may avoid mandatory detention by demonstrating that he . . . was not convicted of a predicate

16  crime, or that the [government] is otherwise *substantially unlikely* to establish that he is in fact

17  subject to mandatory detention." *Demore v. Kim*, 538 U.S. 510, 514 n.3, 523 n.6 (2003)

18  (emphasis added); *see also* 8 C.F.R. § 1003.19(h)(2)(ii).  In *In re Joseph*, 22 I & N Dec. 799

19  (BIA 1999), the Board of Immigration Appeals ("the BIA" or "the Board") held that the

20  government's  allegation that an alien "is deportable" for reasons that would justify mandatory

21  detention is entitled to great deference and *"the Immigration Judge must have very substantial*

22  *grounds to override [the government's] decision to charge the alien with a ground that*

23  *subjects the alien to [mandatory] detention."* 22 I & N Dec. at 800 (emphasis added).  "Thus,"

24  according to the BIA, an alien can avoid mandatory detention "*only* when an Immigration Judge

25  is convinced that [the government] is *substantially unlikely to establish* . . . the charge or

26  charges that subject the alien to mandatory detention." *Id.* (emphasis added).  If the alien carries

27  that onerous burden, he does not win freedom from detention - merely a chance to prove that he

28

1   is worthy of release on bail because he poses no risk of fleeing his removal proceedings or of

2   endangering the community.[1]  That opportunity for an individualized bond hearing is all that Mr.

3   Ali seeks here, but the government's unlawful practices have placed even that modest goal

4   beyond reach.

5       By presuming that Mr. Ali "is deportable" on grounds that trigger mandatory detention

6   unless and until *he demonstrates* that the government is "substantially unlikely" to establish that

7   he is so deportable, the *Joseph* procedures violate the plain language of § 1226(c).  Because "8

8   U.S.C. § 1226(c) tells the Attorney General to 'take into custody any alien who . . . *is*

9   deportable,' not one who may nor may not fall into that category," "[o]nly those immigrants who

10   could not raise a 'substantial' argument against removability [on grounds that would trigger §

11   1226(c)(1)] should be subject to mandatory detention." *Tijani*, 430 F.3d at 1247 (Tashima, J.,

12   concurring)(emphasis in original); *see also Demore*, 538 U.S. at 578-79 (Breyer, J., concurring

13   and dissenting)("[A]s long as Kim's legal arguments are neither insubstantial nor interposed

14   solely for purposes of delay . . . then the immigration statutes, interpreted in light of the

15   Constitution permit Kim (if neither dangerous nor a flight risk) to obtain bail.") .

16       The *Joseph* standard also raises serious due-process concerns under a line of Supreme

17   Court precedents requiring a standard of proof that favors the individual over the government in

18   civil proceedings that threaten important liberty interests. *See, e.g., Woodby v. I.N.S.*, 385 U.S.

19   276 (1966) (concerning removal proceedings); *Santosky v. Kramer*, 455 U.S. 745, 755 (1982)

20   (concerning proceedings to terminate parental rights).  Instead of favoring the individual, the

21   *Joseph* standard heavily favors the government, and in so doing, makes mandatory detention

22   applicable even to those like Mr. Ali who raise substantial arguments against charges of

23

24      [1] *See Joseph*, 22 I & N Dec. at 809 (A determination that an alien "is not properly

25   included in a mandatory detention category . . . simply means that the alien could be considered
by the Immigration Judge for release under the general bond provisions of section 236(a) of the

26   Act," 8 U.S.C. § 1226(a)); *In re Guerra*, 24 I & N Dec. 37, 38 (BIA 2006)(In a custody re-
determination hearing under INA § 236(a), 8 U.S.C. § 1226(a), the immigration judge must

27   consider whether the alien presents a danger to persons or property, is a danger to national
security, or poses a risk of flight.)

28

1  removability that would trigger mandatory detention.[2] To avoid these serious due process

2  concerns and to give effect to the plain language of § 1226(c), which applies only in the case of

3  an alien who "*is* deportable" on grounds that trigger mandatory detention, the Court must

4  interpret § 1226(c) as excluding those who have substantial arguments that they are not, in fact,

---

6  [2] In *Demore*, the U.S. Supreme Court upheld the constitutionality of § 1226(c) as
applied to an alien who *conceded* that he was deportable on grounds that subjected him to
7  mandatory detention. The *Demore* Court did not address the constitutional adequacy of the
*Joseph* procedures as a device for screening out aliens not subject to mandatory detention under §
8  1226(c) and, instead, repeatedly emphasized that Kim had "conceded that he was deportable
because of a conviction that triggers § 1226(c) and thus [had] sought no *Joseph* hearing[.]" *Id.* at
9  514 n.3. *See also id.* at 522 (Kim did not "argue that he himself was not 'deportable' within the
meaning of § 1226(c)."). "In conceding that he was deportable, [Kim] forwent a hearing at
10  which he would have been entitled to raise any substantial argument available to demonstrate
that he was not properly included in a mandatory detention category." *Id.* at 514. Thus, Kim "by
11  his own choice did not receive one of the procedural protections otherwise provided to aliens
12  detained under § 1226(c)." *Id.* at 523 n.6. Accordingly, the *Demore* Court had "no occasion to
review the adequacy of *Joseph* hearings generally in screening out those who are improperly
13  detained pursuant to § 1226(c)." *Id.* at 514 n.3.
14

15     Similarly, the Ninth Circuit has not determined the adequacy of the *Joseph* procedures.
In *Tijani*, the Court avoided the constitutional issues implicated by the *Joseph* procedures by
16  interpreting § 1226(c) as applying only to cases involving the "expedited removal of criminal
aliens" who had "conceded deportability." Because the petitioner in that case contested DHS's
17  charge of deportability and had been detained for 32 months, the Court ruled that his removal
18  proceedings had not been "expeditious" and that "the authority conferred by § 1226(c),"
therefore, could no longer justify his detention. *Id.* In a concurring opinion, Judge Tashima
19  addressed the issue that the majority opinion avoided, i.e., the constitutionality of the *Joseph*
20  procedures. After noting "that individual liberty is one of the most fundamental rights protected
by the Constitution," Judge Tashima found that the *Joseph* decision "gives that right little or no
21  weight." *Tijani*, 430 F.3d at 1244 (Tashima, J., concurring). "Instead, [the *Joseph* decision]
22  establishes a system of 'detention by default' by placing the burden fully on the alien to prove
that he should not be detained." *Id.* "When such a fundamental right is at stake," Judge Tashima
23  noted, the Supreme Court has insisted on heightened procedural protections to guard against the
erroneous deprivation of that right." *Id.* "In particular, the Supreme Court has time and again
24  rejected laws that place on the individual the burden of protecting his or her fundamental rights."
25  *Id.* "In light of [these precedents]," Judge Tashima opined, "the *Joseph* standard is not just
unconstitutional, it is egregiously so" because it "not only places the burden on the [alien] to
26  prove that he should not be physically detained, it makes that burden all but insurmountable."
430 F.3d at 1246 (Tashima, J., concurring). *See also* Bhargava, Shalina, "Detaining Due
27  Process: The Need for Procedural Reform in "*Joseph*" Hearings After *Demore v. Kim*," 31
28  N.Y.U. Rev. L. & S. Change 51 (2006).

1   deportable because of a conviction that triggers mandatory detention.[3]

2       As shown below, Mr. Ali's claim that he is not deportable on grounds that would trigger

3   mandatory detention is not only "substantial" but compelling.  Accordingly, the Court must find

4   that Mr. Ali is not subject to mandatory detention under INA § 236(c)(1)(B), 8 U.S.C. §

5   1226(c)(1)(B), and that he is therefore immediately entitled to an individualized hearing to

6   determine whether he should be released on a reasonable bond.

7                                   **JURISDICTION**

8       . This Court has habeas corpus jurisdiction under 28 U.S.C. § 2241 to review the

9   lawfulness of Mr. Ali's physical custody by the Department of Homeland Security ("DHS").  *INS*

10  *v. St. Cyr,* 533 U.S. 289 (2001); *Demore v. Kim,* 538 U.S. 510 (2003).  *See also Nadarajah v.*

11  *Gonzales,* 443 F.3d 1069, 1075-76 (9th Cir. 2006)(noting that the Real ID Act of 2005 does not

12  divest district courts of jurisdiction to entertain habeas petitions challenging an alien's custody

13  rather than the merits of a final order of removal).

14                                      **VENUE**

15      Venue lies in the Northern District of California, where Mr. Ali is undergoing removal

16  proceedings and where his custodian, Anthony M. Aiello is the Assistant Field Office Director

17  for the Immigration and Customs Enforcement ("ICE") Detention & Removal unit of the San

18  Francisco District Office, is employed and carries out his official duties.  *See Braden v. 30th*

19  *Judicial Circuit Court of Kentucky,* 410 U.S. 484, 493-94 (1973) (noting that venue

20

21      [3] Under long-established principles of due process, the standard of proof employed in a
    government-initiated civil proceeding that threatens important liberty interests must be one that
22  favors the individual over the government, thereby "reflect[ing] the value society places on
    individual liberty." *Santosky,* 455 U.S. at 756 (internal citations omitted).  But the *Joseph*
23  standard used in Mr. Ali's case does the exact opposite: it loads the scales overwhelmingly in
    the government's favor and results in the erroneous detention of aliens who - despite raising
24  substantial arguments against removal - cannot meet *Joseph*'s onerous "substantially unlikely to
    prevail" standard. In such cases, the costs imposed by the *Joseph* standard are especially high,
25  since those wrongfully detained are the aliens most likely to win release on bond and least likely
    to abscond or to take other actions that might jeopardize their success in the removal
26  proceedings.  For the same reasons, the government's interest in detaining those aliens is
27  correspondingly weak.

28  Petition for Writ of Habeas Corpus                    -4-

1  considerations in a habeas proceeding include "where the material events took place; where

2  records and witnesses pertinent to the petitioner's claim are likely to be found; [and] the

3  convenience of the parties").

4  <u>INTRADISTRICT ASSIGNMENT</u>

5  Because a substantial portion of the events that gave rise to this lawsuit occurred in

6  the County of San Francisco, this case should be assigned to the Court's San Francisco division.

7  N.D. Rule 3-2(c) and (e).

8  <u>PETITIONER</u>

9  Mr. Ali is a native citizen of Fiji who has been in DHS custody since July 2007. He is

10  currently being detained in the Yuba County Jail in Marysville, California.

11  <u>RESPONDENTS</u>

12  Anthony M. Aiello is the Assistant Field Office Director for the ICE Detention & Removal

13  unit of the San Francisco District Office, which has jurisdiction over the Yuba County Jail in

14  Marysville, California. Mr. Aiello has the power to release Mr. Ali and is, therefore, sued in his

15  official capacity. *See Vasquez v. Reno*, 233 F.3d 688, 690 (1st Cir. 2000), *cert. denied*, 122 S.Ct.

16  43 (2001). *See also Roman v. Ashcroft*, 340 F.3d 314, 320 (6th Cir. 2003) ("[A]lthough the

17  warden of each detention facility technically has day-to-day control over alien detainees, the INS

18  District Director for the district where a detention facility is located 'has power over' alien

19  habeas petitioners."); *Santiago v. U.S. I.N.S*, 134 F. Supp. 2d 1102, 1103 (N.D. Cal 2001).

20  Anthony S. Murry is the Immigration Judge presiding over Mr. Ali's bond proceedings in

21  San Francisco, California.

22  Julie Myers is the Assistant Secretary of DHS's ICE division. ICE is the component

23  within DHS that is responsible for the detention and removal of non-citizens. Ms. Myers leads

24  the detention and removal functions of ICE and is sued in her official capacity.

25  Respondent Michael Chertoff is sued in his official capacity as the Secretary of the

26  Department of Homeland Security. In this capacity he has responsibility for the administration

27  and enforcement of the immigration laws.

28

1    Respondent Alberto Gonzales is sued in his official capacity, as the Attorney General of the

2    United States, to the extent that 8 U.S.C. § 1103 gives him the authority to detain Mr. Ali and to

3    interpret the law as it is applied by DHS and the U.S. Department of Justice.

4    Mark Chandless is the Warden of the Yuba County Jail in Marysville, California, where Mr.

5    Ali is presently confined.  As the individual with daily physical control over Mr. Ali, Mr.

6    Chandless is a proper respondent to this petition and is sued in his official capacity as Mr. Ali's

7    immediate custodian.  *See Vasquez v. Reno*, 233 F.3d 688, 696 (1st Cir. 2000); *Yi v. Maugans*, 24

8    F.3d 500, 507 (3d Cir. 1994); *Kholyavskiy v. Ahim*, 443 F.3d 946 (7th Cir. 2006); *Robledo-*

9    *Gonzalez v. Ashcroft*, 342 F.3d 667, 673 (7th Cir. 2003).

10                               ### STATEMENT OF THE CASE

11    Mr. Ali is a native and citizen of Fiji who entered the United States 18 years ago, on March

12    13, 1989, with his parents as a tourist.  Exh. 1 (*Notice to Appear*).  He has resided in this country

13    since that time.  For nearly four years, he has been married to a United States citizen, Jevlin

14    Roshima Ali.  Exh. 2 (*Petition for Alien Relative*); 3 (*Marriage Certificate*).  Mr. Ali and his

15    wife have a seven year old son, Imraz, who is also a United States citizen.  Exh. 4 (*Birth*

16    *Certificate*).

17    Although married to a United States citizen and eligible to adjust his status to that of a

18    lawful permanent resident under INA § 245(a), 8 U.S.C. § 1255(a), (see Exh. 5, *Notice of*

19    *Approval of Relative Immigrant Visa Petition*), Mr. Ali is facing removal from the United States

20    pursuant to INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), as an alien who was admitted as a

21    non-immigrant and remained longer than permitted.  Exh. 1 (*Notice to Appear*).  Although DHS

22    never formally charged Mr. Ali with removability under INA § 237(a)(2)(A)(ii), 8 U.S.C. §

23    1227(a)(2)(A)(ii) - as an alien who, after admission, has been convicted of two CIMTs – the IJ

24    found that he "is deportable" and thus subject to mandatory detention pursuant to INA §

25    236(c)(2), 8 U.S.C. § 1226(c)(2).[4]  Accordingly, the IJ denied Mr. Ali's request for an

26

---

27    [4] In a recent case, the BIA ruled "that the 'is deportable' language in the current

28    mandatory custody statute does not require that the alien be charged with or found deportable on

1   individualized bond hearing and ordered that Mr. Ali be held in DHS custody throughout the

2   pendency of his removal proceedings. Exh. 6 (*IJ's Memorandum and Order*, July 23, 2007).

3   Although Mr. Ali appealed that determination to the BIA on August 8, 2007, his appeal remains

4   pending before the BIA.

5                                          <u>ARGUMENT</u>

6   I.   **IN DETERMINING THAT MR. ALI IS SUBJECT TO MANDATORY DETENTION**
         **AS AN ALIEN WHO "IS DEPORTABLE" UNDER INA § 237(a)(2)(A)(ii), 8 U.S.C. §**
7        **1227(a)(2)(A)(ii), THE IJ APPLIED AN INCORRECT LEGAL STANDARD – i.e.,**
         **THE *JOSEPH* STANDARD – AND VIOLATED MR. ALI'S FIFTH AMENDMENT**
8        **RIGHT TO DUE PROCESS.**

9        Mr. Ali is subject to mandatory detention under INA § 236(c)(1)(B), 8 U.S.C. §

10  1226(c)(1)(B), only if he "is deportable" under INA § 237(a)(2)(A)(ii), 8 U.S.C. §

11  1227(a)(2)(A)(ii), as an alien who, after any time after admission, is convicted of two or more

12  crimes involving moral turpitude not arising out of a single scheme of criminal misconduct . . ."[5]

13  In finding Mr. Ali subject to mandatory detention, the IJ noted that he has two criminal

14  convictions. On September 13, 2000, Mr. Ali pled nolo contendere to a felony violation of Cal.

15  Penal Code § 487(A)/508, Grand Theft by Embezzlement. Exh. 7 (*Criminal Docket Sheet, April*

16  *9, 2001*). He was sentenced to eight months in the San Mateo County Jail and 5 years probation,

17  and was released after serving four months. *Id.* at 5; Exh. 8 (*Sheriff's Booking Info. Sheet*). In

18  addition, on October 16, 2006, Mr. Ali pled guilty to a misdemeanor false personation in

19  violation of Cal. Penal Code § 529(3).[6] Exh. 9 (*Criminal Docket Sheet, July 26, 2007*) at 1. For

20

21  the particular ground on which detention is based." *In re Kotliar*, 24 I & N Dec. 124, 126 (BIA
22  2007). Rather, "[w]here the record reflects that an alien has committed any of the offenses"
    enumerated in the mandatory detention statute, "the alien is subject to mandatory detention
23  pursuant to section 236(c)(1)(B) [8 U.S.C. § 1226(c)(1)(B)] as one who 'is deportable' for the
    offense, without regard to whether the Department of Homeland Security ("DHS") has exercised
24  its prosecutorial discretion to lodge a charge based on the offense." *Id.*

25      [5] Although certain other grounds of deportability or inadmissibility can trigger mandatory
26  detention, DHS has never argued that those grounds apply to Mr. Ali.

27      [6] The Criminal Compliant alleges that Mr. Ali "did wilfully and unlawfully and falsely
28  personate Mohammed Shameer, in a private or official capacity and in such assumed character

1  that offense, he was sentenced to 45 days in county jail and two years probation.[7] *Id.* at 24.

2  Mr. Ali does not dispute that Grand Theft by Embezzlement in violation of Cal. Penal Code

3  § 487(A)/508 is a CIMT. *See Rashtabadi v. INS*, 23 F.3d 1562, 1568 (9th Cir. 1994). Whether

4  he "is deportable" under INA § 237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii) and subject to

5  mandatory detention thus turns on whether his second offense – misdemeanor false personation

6  in violation of Cal. Penal Code § 529(3) – is also a CIMT. In concluding that Mr. Ali is subject

7  to mandatory detention, the IJ found that misdemeanor false personation under § 529(3) "requires

8  proof of a deliberate effort to defraud" and is therefore a CIMT. As explained below, that

9  conclusion is patently incorrect. Before addressing that question, however, the Court should

10  address the threshold question of whether the Board's *Joseph* decision erroneously places the

11  burden on Mr. Ali to demonstrate that he is not, in fact, subject to deportation on grounds that

12  would trigger mandatory detention.

13  **A.** **The *Joseph* Standard – Which Allows an Alien to Avoid Mandatory Detention**

14  **"Only" If He Can Convince the IJ That the Government Is Substantially Unlikely to Establish the Charge or Charges That Subject the Alien to**

15  **Mandatory Detention – Violates the Plain Language of Section 1226(c) and Is Blatantly Unconstitutional.**

16  Section 1226(c) plainly applies only to an alien who "is deportable" or inadmissible on

17  certain grounds. Section 1226(c), however, does not define the phrase "is deportable." *Tijani*,

18  430 F.3d at 1243 (Tashima, J., concurring). "The implementing regulations also do little to help;

19  they provide an alien with the opportunity to establish that he is 'not properly included' in the

20  statute's reach, but they say nothing about what, precisely, the alien must show." *Id.*, *citing* 8

21  C.F.R. § 1003.19(h)(ii) (2005). In the *Joseph* case, the BIA attempted to fill the statutory and

22

23

24  did an act whereby any benefit might accrue to the defendant, or to another, in violation of Penal Code section 529(3)." Exh. 10 (*Criminal Complaint*).

25  [7] Upon his release from jail on July 3, 2007, Mr. Ali was taken directly into custody by

26  ICE officers. The government commenced removal proceedings against Mr. Ali with the issuance of a Notice to Appear, which alleges that Mr. Ali remained in the United States beyond

27  March 4, 1989 (the expiration date of his original visa).

28

1   regulatory gap, ruling that the government's allegation that an alien "is deportable" for reasons

2   that would justify mandatory detention is entitled to great deference and *"the Immigration*

3   *Judge must have very substantial grounds to override [the government's] decision to charge*

4   *the alien with a ground that subjects the alien to [mandatory] detention."* 22 I & N Dec. at 800

5   (emphasis added).  According to the BIA, an alien can avoid mandatory detention "*only when an*

6   Immigration Judge is convinced that [the government] is *substantially unlikely to establish . . .*

7   the charge or charges that subject the alien to mandatory detention." *Id.* (emphasis added).

8          The *Joseph* standard, however, is exactly the opposite of what due process requires.  In civil

9   proceedings that threaten important liberty interests, due process requires a standard of proof that

10  is not only *less* favorable to the government than the *Joseph* standard, but one that is *explicitly*

11  *favorable to the individual.  See Chaunt v. United States*, 364 U.S. 350, 353 (1960)(government

12  can revoke a citizen's naturalization only if there is "clear, unequivocal, and convincing"

13  evidence that an individual obtained his citizenship illegally); *Woodby v. I.N.S.*, 385 U.S. 276

14  (1966)(alien can be deported only if deportability is established by clear, unequivocal and

15  convincing evidence).

16         "Procedural due process imposes constraints on governmental decisions which deprive

17  individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of

18  the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  "The

19  fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and

20  in a meaningful manner.'" *Id.* at 333.  Where an alien's due-process liberty interests are at stake,

21  courts employ the three-part *Mathews* test for determining what procedural protections are

22  constitutionally mandated.  *See Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1160-61 (9th Cir.

23  2004).  That test requires the Court to consider: (1) the private interests that will be affected by

24  the official action; (2) the risk of an erroneous deprivation of those interests through the

25  procedures used; and (3) the government's interest, including the function involved and the fiscal

26  and administrative burdens that the additional or substitute procedural requirement would entail.

27  *Id.* at 1161 (*citing Mathews*, 424 U.S. at 335).

28

1    In conducting the *Mathews* analysis, this Court must be mindful of the fact that when a

2    "fundamental right is at stake . . . the Supreme Court has insisted on heightened procedural

3    protections to guard against the erroneous deprivation of that right.  In particular, the Supreme

4    Court has time and again rejected laws that place on the individual the burden of protecting his or

5    her fundamental rights." *Tijani*, 430 F.3d at 1244 (Tashima, J., concurring).  In his concurring

6    opinion in *Tijani*, Judge Tashima meticulously described this unbroken line of Supreme Court

7    precedent.  430 F.3d at 1244-1246 (Tashima, J., concurring).

8    In *Addington v. Texas*, 441 U.S. 418 (1979), for example, the Court vacated a Texas

9    Supreme Court ruling that a person could be civilly committed based upon a finding – by a mere

10    preponderance of the evidence – of mental illness.  *Id.* at 432-33.  In so concluding, the Court

11    described the "function of a standard of proof, as that concept is embodied in the Due Process

12    Clause." *Id.* at 423.  The Court explained that "a standard of proof" serves to allocate the risk of

13    an erroneous decision among litigants based upon the competing rights and interests involved.

14    *Id.*  In a civil case where no fundamental rights are implicated, the interests involved are minor

15    and "society has a minimal concern with the outcome;" consequently, the litigants share the risk

16    of error roughly equally under the preponderance of the evidence standard.  *Id.*  In a criminal

17    case, on the other hand, "the interests of the defendant are of such magnitude" that "our society

18    imposes almost the entire risk of error upon itself" by insisting on the beyond a reasonable doubt

19    standard.  *Id.* at 423-24.[8]

20

_____

21    [8] Similarly, in *In re Winship*, 397 U.S. 358 (1970), the Supreme Court observed that

22    "there is always in litigation a margin of error, representing error in factfinding, which both parties must take into account.  Where one party has at stake *an interest of transcending value* -

23    as a criminal defendant his *liberty* - this margin of error is reduced as to him by the process of placing on the other party the burden of persuading the factfinder at the conclusion of the trial of

24    his guilt beyond a reasonable doubt." *Id.* at 364 (emphases added) (quotation marks, ellipses, and

25    citation omitted).

26    In his much-quoted *Winship* concurrence, Justice Harlan explained that identifying the constitutionally required standard of proof in any given proceeding reflects a "fundamental

27    assessment of the comparative social costs of erroneous factual determinations." *Id.* at 369-70

28    (Harlan, J., concurring).  Justice Harlan cited two principles in support of this contention.  First,

Employing these principles, the Court held that there must be "clear and convincing evidence" of mental illness before an individual could be involuntarily committed and thus deprived of his liberty. *Id.* at 432-33. Noting that it "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection," *id.* at 425, the Court found it improper to ask "[t]he individual ... to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state," *id.* at 427. Thus, the Court concluded that "due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." *Id.* at 427.

As Judge Tashima noted in *Tijani*:

> Since *Addington*, the Supreme Court has repeatedly reaffirmed the principle that "due process places a heightened burden of proof on the State in civil proceedings in which

standards of proof "communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions." *Id.* at 370. And second, it is inevitable that the factfinder will err, sometimes in favor of the prosecuting party, sometimes in favor of the defending party. By calibrating the "degree of confidence" that the factfinder should have in his conclusions, the standard of proof "influences the relative frequency of these two types of erroneous outcomes." *Id.* at 370-71. Therefore, the standard of proof should reflect "an assessment of the comparative social disutility of each" type of error. *Id.* at 371. For example, the preponderance of the evidence standard is "peculiarly appropriate" in a civil damages suit between private parties because in such cases, society regards it as "no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor." *Id.* at 371.

Justice Harlan's reasoning figured prominently in later Supreme Court decisions holding that due process requires an elevated proof standard when an individual's vital liberty or property interests are threatened by government-initiated civil proceedings. In such cases, the social disutility of erroneous findings against the individual far outweighs the social disutility of erroneous findings against the government. These cases teach that, "in any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." *Santosky v. Kramer*, 455 U.S. 745, 755 (1982). Thus, "[i]n cases involving individual rights, whether criminal or civil, the standard of proof at a minimum reflects the value society places on individual liberty." *Id.* at 756 (quotations, brackets, and citation omitted).

the 'individual interests at stake ... are both particularly important and more substantial than mere loss of money.'" *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 756 (1982)) (internal quotation marks omitted). In *Santosky*, for example, the Court considered a New York law that allowed the state to terminate parental rights upon proof of "permanent neglect" by a preponderance of the evidence. 455 U.S. at 747. Because the statute directly affected the "fundamental liberty interest of natural parents in the care, custody, and management of their child," *id.* at 753, the Court held that it needed to include greater procedural protection than the preponderance of the evidence standard. *Id.* at 769-70.

Again, in *Foucha v. Louisiana*, 504 U.S. 71 (1992), the Court found a statute unconstitutional that placed on civilly committed individuals the burden of proving that they were not a danger to the public before allowing their release. *Id.* at 73, 83. Noting that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," the court held that such a system failed adequately to protect the individual's liberty interest. *Id.* at 83 (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). Once again, because "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause," clear and convincing evidence was needed to civilly commit the individual. *Id.* at 80.

Finally, in *Cooper*, the Court unanimously rejected a state-law presumption that a defendant was competent to stand trial unless that defendant established his incompetence by clear and convincing evidence. 517 U.S. at 350. Stating that "we perceive no sound basis for allocating to the criminal defendant the large share of the risk which accompanies a clear and convincing evidence standard," the Court held that the Oklahoma law violated due process. *Id.* at 366.

*Tijani*, 430 F.3d at 1245 (Tashima, J., concurring).

With these precedents in mind, the Court must apply the *Mathews* factors to the BIA's decision in *Joseph*.

1.    Affected Interest of the Individual.

The first prong of the *Mathews* analysis requires this Court to assess both the seriousness and the duration of the wrongful deprivation that might result from an erroneous determination in a *Joseph* hearing. "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss.'" *Santosky*, 455 U.S. at 758 (citation and quotation marks omitted). Whether that loss is grave enough to warrant a heightened proof standard will therefore turn on "the nature of the private interest threatened" and "the permanency of the threatened loss." *Id.* Even where not permanent, the "possible *length* of wrongful deprivation" is an "important factor in assessing the impact of a challenged administrative practice. *Mathews*, 424 U.S. at 341-342 (emphasis added) (citation and quotation marks omitted) (discussing erroneous termination of social-security benefits). Thus, the

1   "torpidity" of the administrative review process may itself impose significant hardships that merit

2   consideration under the first *Mathews* prong. *Id.*

3       Mr. Ali has a fundamental liberty interest in being free from indefinite bodily restraint. *See*

4   *Zadvydas v. Davis,* 533 U.S. 678, 690 (2001)("Freedom from imprisonment – from government

5   custody, detention, or other forms of physical restraint – lies at the heart of the liberty [the Due

6   Process] Clause protects."); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)("Freedom from bodily

7   restraint has always been at the core of the liberty protected by the Due Process Clause from

8   arbitrary governmental action."). Because Mr. Ali is eligible for adjustment of status under INA

9   § 245(a), 8 U.S.C. § 1255(a), and an accompanying waiver of inadmissibility under INA §

10  212(h), 8 U.S.C. § 1182(h), it is likely that his removal proceedings will be protracted, enduring,

11  at a minimum, many months. Indeed, by the time of his next hearing, December 13, 2007, Mr.

12  Ali will have been detained for more than five months. Exh. 11 (*Declaration of Robert B. Jobe*).

13  In the event of an appeal, Mr. Ali's proceedings will likely endure for well over a year. *Id.*

14  Accordingly, the Court should find that Mr. Ali's interest in being free from bodily restraint

15  during the pendency of these proceedings is of the most fundamental nature, and should be

16  granted the highest level of due process available to anyone who is present in the United States.

17      2.    Risk of Error and Probable Value of Additional Safeguards.

18      Under *Mathews* and its progeny, this Court "next must consider both the risk of erroneous

19  deprivation of private interests resulting from use of [the *Joseph*] standard and the likelihood that

20  a higher evidentiary standard would reduce that risk." *Santosky*, 455 U.S. at 761. Since a *Joseph*

21  hearing is an "adversary contest" between the detainee and the government, "the relevant

22  question is whether [the *Joseph*] standard fairly allocates the risk of an erroneous factfinding

23  between these two parties." *Id.*

24      In this respect, "the *Joseph* standard is not just unconstitutional, it is egregiously so." *Tijani*,

25  430 F.3d at 1246 (Tashima, J., concurring). As noted above, the Supreme Court repeatedly has

26  held that individuals, including aliens, may not be deprived of physical liberty or other important

27  interests under any standard of proof less demanding than "clear and convincing evidence"; a

28

1    mere "preponderance of the evidence" standard will not do.  *See, e.g., Chaunt*, 364 U.S. 350;

2    *Woodby*,  385 U.S. 276; *Addington*, 441 U.S. 418; *Santosky*, 455 U.S. 745; *Foucha*, 504 U.S. 71.

3         Yet the *Joseph* standard subjects an alien to detention based on a standard of proof far *less*

4    favorable to the alien than the preponderance of the evidence standard that the Supreme Court

5    held *inadequate* in its standard of proof cases.  Under *Joseph*, the alien must remain locked up

6    unless *he* can prove that the government is "substantially unlikely to prevail" on any charge of

7    removability that would implicate mandatory detention - which is tantamount to *inverting* the

8    law's most demanding proof standard ("beyond a reasonable doubt") and deploying it *against* the

9    individual whose physical liberty is at stake.

10         If the preponderance standard fails to pass constitutional muster in situations like this one,

11    then, *a fortiori*, the *Joseph* standard cannot withstand the slightest constitutional scrutiny.

12    Because it is so heavily skewed toward the government's side, the *Joseph* standard inevitably

13    will result in the erroneous detention of many aliens who ultimately will be found not subject to

14    mandatory detention, but who cannot carry the onerous burden of proving that the government is

15    "substantially unlikely [to] prevail" in removal proceedings.  Yet these are some of the aliens

16    *least* likely to present a flight risk because they have a real hope of prevailing - and of thereby

17    preserving their legal claims to remain - if they see their removal proceedings through to the end.

18    Likewise, they are the aliens *most* likely to win release if granted an individualized bond hearing.

19    Consequently, the Court must find that a higher evidentiary standard undoubtedly will render

20    *Joseph* hearings more accurate than they presently are under the wildly skewed *Joseph* standard.

21         3.    Governmental Interest And Potential Burden.

22         This prong *of Mathews* asks the Court to identify the governmental interests at stake in a

23    *Joseph* hearing and to assess whether a standard of proof "more strict than" the *Joseph* standard

24    is consistent with those interests.  *Santosky*, 455 U.S. at 766.

25         The skewed nature and gross inaccuracy of the *Joseph* standard cannot be justified by simply

26    citing the legislative purposes behind § 1226(c).  According to the *Demore* decision, the statute

27    has two such purposes: (1) "preventing deportable aliens from fleeing prior to or during their

28

1    removal proceedings, thus increasing the chance that, if ordered removed, [they] will be

2    successfully removed," 538 U.S. at 528; and (2) preventing criminal aliens who remain in the

3    United States from committing additional crimes before being removed. *Id.* at 518.

4       But those governmental interests are considerably less compelling here than they were in

5    *Demore*. The alien in *Demore* had ***conceded*** deportability on grounds that subjected him to

6    mandatory detention.[9] Mr. Ali's case is altogether different. He does *not* concede that he "is

7    deportable" on a ground that would subject him to mandatory detention, and he is armed with

8    sophisticated and substantial arguments against removal. Indeed, as explained below, California

9    Supreme Court precedent strongly indicates that Mr. Ali's second conviction is not one involving

10   moral turpitude. Moreover, Mr. Ali is immediately eligible to adjust his status to that of a lawful

11   permanent resident (through an approved petition made by his wife). The fight to determine

12   whether Mr. Ali should be awarded that discretionary form of relief, however, could take many

13   months and, quite possibly, well over a year. Thus, the governmental interests that justified

14   mandatory detention in Kim's case have a much weaker claim on Mr. Ali's freedoms. If due

15   process "is not a technical conception with a fixed content unrelated to time, place and

16   circumstances" - if indeed it is "flexible and calls for such procedural protections as the particular

17   situation demands" - then the Court's *Mathews* analysis must take account of the important

18   differences between an alien like Kim who concedes removability on grounds that would subject

19   him to mandatory detention and one like Mr. Ali who does not. *Mathews*, 424 U.S. at 334

20   (citations and quotation marks omitted).

21      Moreover, Supreme Court precedent demonstrates that the policy concerns cited in *Demore*,

22   in and of themselves, will not dictate the standard of proof required in a civil proceeding that

23

---

24      [9]  *See Demore*, 538 U.S. at 531 ("The INS detention of respondent, a criminal alien who
     has *conceded that he is deportable* . . . is governed by" cases upholding detention during removal
25   proceedings) (emphasis added); *id.* at 523 n.6 ("As respondent has *conceded that he is
     deportable* for purposes of his habeas corpus challenge to § 1226(c) at all previous stages of this
26   proceeding.... *we decide the case on that basis.*") (emphases added); *see also Gonzalez v.
     O'Connell*, 355 F.3d 1010, 1019 (7th Cir. 2004) (observing that *"Kim's* holding was expressly
27   premised on" fact that Kim had conceded deportability).

28

1  threatens a serious deprivation of individual liberty.  For example, in *Woodby*, the Court

2  imposed a "clear, unequivocal, and convincing evidence" standard of proof even though Woodby

3  admitted that, after being admitted to this country, she had engaged in prostitution - a crime then

4  deemed sufficiently antisocial that Congress had designated it a deportable offense.  *See* 385 U.S.

5  at 280 n.5.  In *Addington*, the Supreme Court imposed the "clear and convincing evidence"

6  standard of proof even though the state maintained that Addington "suffered from serious

7  delusions, that he often had threatened to injure both of his parents and others, that he had been

8  involved in several assaultive episodes while hospitalized and that he had caused substantial

9  property damage both at his own apartment and at his parents' home." 441 U.S. at 420-21.  Each

10  of these cases involved governmental interests that were compelling, or that were deemed to be

11  so at the time that the Supreme Court imposed a heightened standard of proof.  Yet none of those

12  interests could override society's countervailing interest in fairly and appropriately allocating the

13  risk of error in a civil proceeding that threatened a serious deprivation of individual liberty.

14       Finally, the administrative costs of adopting a higher standard of proof in *Joseph* hearings

15  would be minimal.  No new hearing or procedure would be required - merely the use of a

16  different but hardly novel legal standard.  Under Mr. Ali's standard, an alien is "not properly

17  included" within the category of aliens subject to mandatory detention under § 1226(c), and

18  therefore should be granted an individualized bond hearing, if he presents a substantial argument

19  against any charge of removal that implicates mandatory detention.  "[S]uch a standard

20  adequately conveys to the factfinder the level of subjective certainty about his factual conclusions

21  necessary to satisfy due process." *Santosky*, 455 U.S. at 769.[10]  Although Mr. Ali's proposal

---

23  [10]  Like Judge Tashima, Justice Breyer has suggested that an alien held in mandatory

24  detention under § 1226(c) should be permitted to seek release on bail "so long as [his] legal

25  arguments [against removal] are neither insubstantial nor interposed solely for purposes of

delay[.]" *Demore*, 538 U.S. at 577 (Breyer, J., concurring in part and dissenting in part). And in

26  *Gonzalez v. O'Connell*, 355 F.3d 1010 (7th Cir. 2004), the Seventh Circuit observed that *Kim*

27  "left open the question of whether mandatory detention under § 1226(c) is consistent with due

process when a detainee makes *a colorable claim* that he is not in fact deportable." *Id.* at 1019-20

28  (emphasis added).

1  favors the detainee, that is appropriate for at least two reasons. *First*, as we have seen, the

2  Supreme Court has repeatedly tipped the scales in the individual's favor when "the individual

3  interests at stake" in a civil proceeding "are both 'particularly important' and 'more substantial

4  than mere loss of money.'" *Santosky*, 455 U.S. at 765 (citation omitted).  *Second*, winning a

5  *Joseph* hearing under Mr. Ali's standard will *not* hand the alien the keys to his detention cell.  All

6  it will do is qualify him for an individualized bond hearing at which he can try to persuade an

7  immigration judge that he poses no risk of flight or danger to the community.

8      Thus, a proper *Mathews* analysis demonstrates that errors resulting in serious and potentially

9  lengthy deprivations of physical liberty are made far more likely by use of the *Joseph* standard,

10  and are not justified by any countervailing governmental interest in those who contest removal.

11  **B.**    **To Avoid the Serious Due Process Concerns Described Above, the Court Must
       Construe the Term "is Deportable" in § 1226(c) as Encompassing Only Those
12     Aliens Who Have No Substantial Argument Against The Charges of
       Removability That Trigger Mandatory Detention.**
13

14  "[A]n Act of Congress ought not be construed to violate the Constitution if any other

15  possible construction remains available." *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490,

16  500 (1979) (citing *Murray v. The Charming Betsy*, 2 Cranch. 64, 118, 2 L. Ed. 208 (1804)).

17  Indeed, "every reasonable construction must be resorted to, in order to save a statute from

18  unconstitutionality,' unless those saving constructions are "plainly contrary to the intent of

19  Congress." *DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568,

20  575 (1988) (internal citation and quotation marks omitted).[11]

21

22  [11]  The constitutional-doubt doctrine often arises in cases challenging an executive
    agency's statutory interpretation, as embodied in a regulation or agency adjudication. In such
23  cases, the doctrine of constitutional doubt takes precedence over the familiar *Chevron* doctrine of
    judicial deference to reasonable agency interpretations. *See DeBartolo*, 485 U.S. at 574; *cf.*
24  *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 & n.9
    (1984). As the Ninth Circuit observed, "*Chevron* deference is limited by the reasonableness of
25  the agency's interpretation, and we must attempt to preserve the statute's constitutionality even if
    such a reading conflicts with the agency's interpretation." *Flores-Chavez v. Ashcroft*, 362 F.3d
26  1150, 1162 (9th Cir. 2004). The same principles of course apply to agency interpretations of the
    INA. Thus, the Supreme Court has "read significant limitations into ... immigration statutes in
27  order to avoid their constitutional invalidation." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).

28

1   Thus, the Court must construe § 1226(c) to avoid the serious constitutional concerns

2   described above.  Fortunately, however, a saving construction is readily available and actually

3   appears to be compelled by the plain language of § 1226(c).  As Judge Tashima noted in *Tijani*,

4   "8 U.S.C. § 1226(c) tells the Attorney General to 'take into custody any alien who . . . *is*

5   deportable,' not one who may nor may not, fall into that category." *Tijani*, 430 F.3d at 1247

6   (Tashima, J., concurring)(emphasis in original).  Thus, "[o]nly those immigrants who could not

7   raise a 'substantial' argument against removability [on grounds that would trigger § 1226(c)(1)]

8   should be subject to mandatory detention." *Id.*

9   **II.  MR. ALI'S ARGUMENT AGAINST HIS DEPORTABILITY UNDER INA §**
    **237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii), IS NOT ONLY SUBSTANTIAL BUT**
10  **COMPELLING.**

11   Mr. Ali is subject to mandatory detention under INA § 236(c)(2)(B), 8 U.S.C. §

12  1226(c)(2)(B), only if he "is deportable" as an alien who has been convicted of two CIMTs,  In

13  finding that Mr. Ali is so deportable, the IJ expressly found that Mr. Ali's misdemeanor

14  conviction for false personation constitutes a CIMT.  Exh. 6 (*IJ's Memorandum and Order, July*

15  *23rd, 2007*)("Because section 529.3 requires proof of a deliberate effort to defraud, the court finds

16  that it s a crime of moral turpitude. [Mr. Ali] therefore stands convicted of two crimes of moral

17  turpitude and is subject to mandatory detention.).  In doing so, the IJ unquestionably erred.

18   The touchstone of a crime involving moral turpitude is an evil intent.  *See Goldeshtein v.*

19  *INS,* 8 F.3d 645, 647 (9th Cir. 1993)(The determination of whether a crime involves moral

20  turpitude "turns on whether evil intent . . . . is an essential element of the crime.").  "A crime that

21  does not necessarily involve evil intent, such as intent to defraud, is not necessarily a crime

22  involving moral turpitude." *Hirsch v. INS*, 308 F.2d 562, 567 (9th Cir. 1962).  In determining

23  whether a crime involves moral turpitude, the Court must apply the two-step "categorical"

24  approach set forth in *Taylor v. United States*, 495 U.S. 575 (1990). *See Fernandez-Ruiz v.*

25  *Gonzales,* 468 F.3d 1159,1163 (9th Cir. 2006)*, citing Cuevas-Gaspar v. Gonzales*, 430 F.3d

26  1013, 1017 (9th Cir. 2005).  Under the categorical approach, the Court first must "make a

27  categorical comparison of the elements of the statute of conviction to the generic definition [of a

28

1   "crime involving moral turpitude"] and decide whether the conduct proscribed [by the state

2   statute] is broader than, and so does not categorically fall within, this generic definition."

3   *Huerta-Guevara v. Ashcroft,* 321 F.3d 883, 887 (9th Cir. 2003).  Under this approach, "[t]he

4   issue is not whether the actual conduct constitutes a crime involving moral turpitude, but rather,

5   whether the full range of conduct encompassed by the statute constitutes a crime of moral

6   turpitude." *Fernandez-Ruiz v. Gonzales,* 468 F.3d at 1163, *quoting Cuevas-Gaspar,* 430 F.3d at

7   1017.

8       If the statute of conviction is not a categorical match because it criminalizes both conduct

9   that does and does not involve moral turpitude, the Court must apply a "modified" categorical

10  approach "under which [it] may look beyond the language of the statute to a narrow, specified set

11  of documents that are part of the record of conviction, including the indictment, the judgment of

12  conviction, jury instructions, a signed guilty plea, or the transcript from the plea proceedings,"

13  *Fernandez-Ruiz,* 468 F.3d at 1163-64, *quoting Tokatly v. Ashcroft,* 371 F.3d 613, 620 (9th Cir.

14  2004) (internal quotation marks omitted), to determine of Mr. Singh was in fact convicted of an

15  offense that qualifies as a crime of moral turpitude.  The Court may not, however, "look beyond

16  the record of conviction itself to the particular facts underlying the conviction." *Cuevas-Gaspar,*

17  430 F.3d at 1020, *quoting Tokatly,* 371 F.3d at 620.  *See also Galeana-Mendoza v. Gonzales,*

18  465 F.3d 1054, 1058 (9th Cir. 2006).

19      In this case, the IJ did not resort to the modified categorical approach.  Instead, the IJ noted

20  that "crimes involving fraud are generally to be considered crimes of moral turpitude" and then

21  opined that because false personation requires "proof of a deliberate effort to pass oneself off as

22  another person," it necessarily and categorically involves moral turpitude.  This is nonsense.

23      Cal. Penal Code § 529(3) provides:

24          Every person who falsely personates another in either his private or official capacity,
        and in such assumed character . . . does any . . . act whereby, if done by the person falsely
25      personated, he might, in any event, become liable to any suit or prosecution, or to pay any
        sum of money, or to incur any charge, forfeiture, or penalty, or whereby any benefit might
26      accrue to the party personating, or to any other person.

27  In *People v. Rathert,* 24 Cal.4th 200, 205-06 (2000), the Supreme Court of California described

28

1    the *mens rea* required under Cal. Penal Code § 529(3) as follows:

2       Section 529, paragraph 3 does not explicitly require that a defendant who impersonates
        another specifically intend to cause the latter to become liable to any suit or prosecution or
3       to pay any sum of money, or specifically intend to benefit defendant himself or another
        person. The Legislature included in paragraph 3 none of the language typically denoting
4       specific intent, such as "with the intent that" or "for the purpose of." (See *People v. Hering,*
        *supra,* 20 Cal.4th at p. 446.) To the contrary, paragraph 3 is framed in language reasonably
5       susceptible of only one interpretation: that the Legislature sought to deter and to punish all
        acts by an impersonator that might result in a liability or a benefit, whether or not such a
6       consequence was intended or even foreseen. No fewer than seven times does the word "any"
        appear in the statute: "[A]ny other act ... in *any* event ... *any* suit or prosecution ... *any* sum of
7       money ... *any* charge ... *any* benefit ... *any* other person." (§ 529, par. 3, italics added.) The
        impersonator's act, moreover, is criminal provided it *might* result in any such consequence;
8       no higher degree of probability is required.

9           The IJ's suggestion that Cal. Penal Code § 529(3) is a "fraud" offense is way off base. The

10   *sine qua non* of a fraud offense is "[a] knowing misrepresentation of the truth or concealment of

11   a material fact *to induce another to act to his or her detriment*." Black's Law Dictionary (8[th] ed.

12   2004 at 685 (emphasis added). Cal. Penal Code § 529(3), however, does not require any specific

13   intent to cause another person "to become liable to any suit or prosecution or to pay any sum of

14   money, or specifically intend to benefit defendant himself or another person.. " *Rat*hert, 24

15   Cal.4th at 205. Rather, "the Legislature sought to deter and to punish all acts by an impersonator

16   that might result in a liability or a benefit, whether or not such a consequence was intended or

17   even foreseen." *Id.* at 206. Moreover, the statute does not require commission of an act that

18   will *likely* trigger a disability or benefit. To the contrary, "[t]he impersonator's act . . . is criminal

19   provided it *might* result in any such consequence; no higher degree of probability is required."

20   *Id.*

21       In light of the California Supreme Court's definitive interpretation of Cal. Penal Code §

22   529(3) and the Ninth Circuit's admonition that a categorical approach must be employed in

23   determining whether a crime offense qualifies as a CIMT, the Court must conclude that Mr. Ali's

24   contention that he is not deportable under INA § 237(a)(2)(a)(ii), 8 U.S.C. § 1227(a)(2)(a)(ii), is

25   not only substantial but compelling. *See Notash v. Gonzales*, 427 F.3d 693, 698 (9th Cir.

26   2005)("Unlike Carty, where the statute of conviction explicitly required the intent to evade taxes,

27   §542 does not require an intent to deprive the United States of revenue. Intent to defraud

28

1  accordingly is neither explicit nor implicit in the nature of the crime.  We therefore disagree with

2  the IJ's conclusion that a conviction under this paragraph categorically is a crime involving moral

3  turpitude."); *Goldeshtein v. INS*, 8 F.3d 645, 649 (9th Cir. 1993) ("Goldeshtein did not obtain

4  anything from the government by deceit, graft, trickery, or dishonest means."  This is in contrast

5  to cases where convictions have been held to be CIMTs which "all involve some false or

6  deceitful conduct through which the alien obtained something from the government"); *cf.*

7  *Winestock*, 576 F.2d at 235 (intent to defraud is inherent in the offense of dealing in counterfeit

8  obligations because petitioner had "admitted intending to pass off something valueless as being

9  something of value"); *Bisaillon v. Hogan*, 257 F.2d 435, 437 (9th Cir. 1958) (fraud was inherent

10 where the statute "requires for conviction proof of a false statement, knowingly and willfully

11 made, with intent to obtain the issuance of a passport contrary to law"), cert. denied, 358 U.S.

12 872 (1958); *United States ex rel. Popoff v. Reimer*, 79 F.2d 513, 515 (2d Cir.1935) (fraud is

13 inherent in the offense of making false statements on behalf of an alien in order to allow the alien

14 to obtain naturalization); *Matter of R-*, 5 I & N Dec. 29, 38 (BIA 1952) (fraud is inherent in a

15 conviction for knowingly making a false statement for the purpose of evading military service

16 because the defendant "attempted to deceive the Government through false representations for

17 the purpose of obtaining an occupational deferment to which he was not entitled").

18 //

19 /

20 //

21 //

22 //

23 //

24 //

25 //

26 //

27 //

28

## CONCLUSION

For the foregoing reasons, the Court should find that Mr. Ali is not subject to mandatory detention. Accordingly, the Court should issue a writ of habeas corpus directing Respondents to immediately give Mr. Ali an individualized bond hearing or a *Joseph* hearing that comports with due process and the plain language of INA § 236(c), 8 U.S.C. § 1226(c).

Dated: September 12, 2007          Respectfully submitted,

LAW OFFICE OF ROBERT B. JOBE

Robert B. Jobe
Shoshana O'Keefe
550 Kearny Street, Suite 200
San Francisco, CA 94108
(415) 956-5513 (phone)
(415) 840-0308 (fax)

Attorneys for Petitioner